This is an action for recovery of an overpayment of FICA tax of $13,876, assessed interest of $5,925.34 (a total of $19,801.34), plus interest on the total. The tax is for the quarter ended March 31, 1972. Defendant has counterclaimed for $468,954.19, covering FICA tax (and interest) for the last three quarters of 1972 and all of the quarters of 1973, 1974, and 1975, and also for FUTA tax (and interest) for 1972, 1973, 1974, and 1975. The subjects of the taxes were (a) the excess of the fair market value of cafeteria meals provided by plaintiff to its employees over the amounts paid by the employees for the meals, and (b) supper money paid by plaintiff to certain of its employees.
On the basis of a detailed statement of facts plaintiff has moved for summary judgment on its own case and on the counterclaim. Defendant’s response is that it has "no objection to the entry of judgment, based on plaintiffs statement of facts (Br. 5-12), allowing plaintiff to recover $19,801.34, plus interest according to law, and dismissing the counterclaim.”
Plaintiff asks that in implementing defendant’s consent, we set forth "the facts and issues of this case” so that there will be available to plaintiff whatever collateral estoppel *594 may flow for other of plaintiffs tax years from the entry of judgment in this case. Defendant has not objected to this request or indicated any reason why it should not be followed. Accordingly, in the Appendix we set forth pages 5-12 of plaintiffs opening brief containing the statement of facts which defendant has expressly accepted as the basis for its concession.
Plaintiff has withdrawn its original requests for costs and attorneys’ fees.
it is therefore ordered that plaintiff is entitled to recover and judgment is entered to that effect. The counterclaim is dismissed. The case is remanded to the Trial Division under Rule 131(c) for determination of the amount of plaintiffs recovery.
On February 20, 1981 the court entered judgment for plaintiff and against defendant for $19,801.34 for the first quarter of 1972, plus statutory interest.
Appendix
Statement Of Facts
1. Plaintiff is a corporation organized and existing under the laws of the State of Illinois. Its principal office and place of business is at 111 West Monroe Street, Chicago, Illinois 60603.
2. This suit and the causes of action herein set forth arise under Acts of Congress, and regulations thereunder of the Treasury Department, providing for internal revenue. This suit is brought, pursuant to and within the period prescribed by such Acts and regulations for the recovery of internal revenue taxes and interest erroneously or illegally assessed or collected or of sums wrongfully assessed and collected under the internal revenue laws. This Court’s jurisdiction is founded upon Title 28, United States Code, Section 1491.
3. Plaintiff is and always has been the sole and absolute owner of the claims herein presented and has never made any transfer or assignment of such claims or any part *595 thereof. No action on these claims has been taken before the Congress of the United States or before any of the departments of the government other than this action before the Treasury Department. No other suit or process by plaintiff or any assignee is pending on such claims in any other court.
4. Plaintiff is and at all material times has been engaged in the banking business. Incident to such business plaintiff employs a large number of individuals. During the year 1972, plaintiffs average number of employees at its Chicago offices was between 2,700 and 2,800.
5. During 1972, there were a total of approximately 170 full-time and 55 part-time employees who were working either the evening shift from 4:00 P.M. to 12:30 A.M. or the night shift from 12:00 A.M. to 7:00 A.M. (except guards, who work from 6:00 P.M. to 6:00 A.M.).
6. During the year 1972, in connection with its banking operations, plaintiff operated cafeteria facilities at which its employees could purchase and consume food at their option. These facilities were located at: 311 West Monroe Building (2nd Floor) and 111 West Monroe Building (8th Floor).
7. Banking hours are from 8:30 A.M. to 5:15 P.M. (or appropriate hours for other shifts).
8. Employees are allowed forty-five (45) minutes for lunch. Staggered lunch periods begin at 10:15 A.M. and end at 2:15 P.M.
9. Employees are not required to eat in the cafeteria and are free to leave the buildings during their lunch periods if they wish.
10. Employees who use the cafeterias are charged only for what they actually purchase. They are free to use the cafeterias for "brown-bagging” free of any charge.
11. The cafeterias are open to all employees irrespective of their title or pay level.
12. With the exception of non-employees holding temporary or guest passes, plaintiffs cafeteria facilities are only open to plaintiffs employees. Because the plaintiff monitors the use of the cafeteria facilities by serving food to only those individuals who have been issued cafeteria passes, it *596 issues on a daily average, approximately fifteen temporary and forty guest passes each day.
13. No work is done or service rendered by the employees while consuming meals in the cafeteria facilities.
14. Night food services are also provided in the cafeteria facilities during the hours between 6:00 P.M. and 9:00 P.M., and 11:00 P.M. and 4:00 A.M. for those employees working the twilight and night shifts. Employees are allowed forty-five (45) minutes for such meals.
15. In the year 1972 plaintiff provided supper money allowances to employees who worked on the plaintiffs premises two or more hours overtime on any particular day. Most frequently, an employee was given one dollar to allow him/her to purchase meals from the vending machines on the plaintiffs premises. Occasionally, and in particular, at plaintiffs locations where cafeteria facilities were not provided, the employee would be reimbursed the exact cost of his/her meal.
16. The cafeteria facilities were operated pursuant to a Food Service Agreement dated May 27, 1969 which was entered into by and between the plaintiff and an unrelated company, Canteen Corporation ("Canteen”) a Delaware corporation with its principal office at Room 1430 Merchandise Mart, Chicago, Illinois.
17. Under the terms of the Food Service Agreement, the plaintiff granted to Canteen the right and license to operate the cafeteria facilities and Canteen agreed to prepare, serve and sell food, food products and non-alcoholic beverages to officers, employees and invited guests.
18. During the year 1972, plaintiff paid an aggregate of $34,596.91 in supper money allowances.
19. At all relevant times, and pursuant to the requirements of Chapters 21 and 23 of the Internal Revenue Code, plaintiff has timely filed quarterly and annual employment tax returns (Forms 940 and 941) with the District Director, Chicago, Illinois, and has duly paid employment taxes on the "wages” paid to its employees as shown therein except that plaintiff incurred a late-filing penalty with respect to the calendar quarter ended December 31,1974.
20. Plaintiff did not include any amount representing the value of the cafeteria meals, facilities or the supper money *597 allowances made available or paid to plaintiffs employees on any of the employment tax returns described in paragraph 19.
21. In a letter dated May 20, 1976 (Form L-191B) addressed to the plaintiff, the District Director transmitted a report of an examining agent dated January 30, 1976 proposing a deficiency under the Federal Insurance Contributions Act (FICA) of $33,217.68 relating to the cafeteria facility and $2,230.80 relating to payments of supper money for a total of $35,448.48 for the year 1972.
22. As communicated to plaintiff by Dorothy Clanton, the Internal Revenue Service’s examining agent, she computed FICA and Federal Unemployment Tax Act (FUTA) tax deficiencies for the year 1972 in the following manner. She first determined the percentage of employees whose earnings during 1972 were less than the FICA and FUTA maximum earnings amount. She then applied that percentage — 62 percent for FICA wages — to the plaintiffs net cafeteria expense of $515,162.42 to arrive at the amount of $319,400.72 for additonal FICA wages. The agent then applied the applicable tax rate (10.4 percent for FICA) to this amount to determine the amount of tax due for the year 1972, as set forth in the report of examining agent dated January 30, 1976, which was transmitted by a letter from the District Director May 20,1976.
23. Subsequently, on October 27, 1978, the District Director of the Chicago District of the Internal Revenue Service assessed FICA tax against plaintiff in the amount of $13,876.00 for the quarter ended March 31, 1972, together with interest of $5,925.34, totalling $19,801.34. The assessment was computed on a different basis from that employed by the examining agent. Although defendant’s agents have indicated that the assessment was computed on the basis that the cafeteria facilities and meal allowances provided by plaintiff to its employees constituted "wages” for purposes of FICA and FUTA employment taxes, the parties have not been able to determine how the assessment was actually computed.
24. On November 14, 1978, the plaintiff paid to the defendant the additional employment tax liability for FICA taxes for the quarter ended March 31, 1972 in the amount *598 of $13,876.00 plus interest assessed thereon of $5,925.34, or a total of $19,801.34.
25. Thereafter, on November 14, 1978 and subsequent to the payment of employment taxes described in paragraph 24, plaintiff filed with the defendant’s representatives a claim (Form 843) seeking refund of such payment on the grounds therein set forth. Said claim was timely filed within two years after the date of payment of the taxes and interest.
26. Plaintiff received by certified mail a notice from the defendant’s representative, the District Director, dated January 3, 1979 disallowing plaintiffs claim for refund in full.
27. On March 21, 1979, plaintiff filed a petiton with this Court seeking refund of the $19,801.34, representing the FICA tax and interest it paid for the quarter ended March 31,1972, plus interest and costs.
28. On July 16, 1979, the Secretary of the Treasury authorized the filing of a counterclaim for $468,954.49 which amount had been assessed against plaintiff in part on October 27, 1978, and in part on November 27, 1978. The assessment was for additional FICA tax, plus interest, for the last three quarters of 1972 and all of the quarters of 1973,1974 and 1975, a late payment penalty for the fourth quarter of 1974, and for additional FUTA tax, plus interest, for the years 1972, 1973, 1974 and 1975. The assessment involves the same issue and, for all practical purposes, the same facts that were already in this suit except that it involves different taxable periods.
29. After moving to file a counterclaim and having the motion granted by this Court on March 18, 1980, the defendant under the direction of the Chief of the Court of Claims Section (as delegate of the Attorney General) filed a counterclaim for $468,954.49.
30. On April 23, 1980, plaintiff filed its reply to defendant’s counterclaim, in which plaintiff admitted the fact of the assessment, denied the legality of the assessment and requested the Court to deny defendant judgment on its counterclaim.
By the affidavit of John L. Stephens (Attachment A hereto), who was during the years at issue, a Vice President *599 of Personnel Administration, later a Senior Vice President, and now Executive Vice President of the Plaintiff in charge of Corporate and Employee Relations, and who has personal knowledge of the facts pertaining to this case, the plaintiff submits the following additional facts, as to which there is no genuine issue:
31. Both the subsidized cafeteria facilities and "supper money” reimbursements to employees of the Harris Bank and the operation of those programs ("Programs”) during the years 1972 through 1975 were provided to bank employees primarily in order to enable the Harris Bank to continue its long standing policy of limiting employees to a 45 minute meal break.
32. Both Programs were available to all employees regardless of job category or compensation level.
33. It was the Harris Bank’s policy that the prices charged employees for purchased meals was approximately the cost of the ingredients and such prices were periodically adjusted to reflect changes in such costs.
34. The cafeteria meal subsidies and the supper money reimbursements formed no part of the contract of employment (written or unwritten) with any Bank personnel. All Harris Bank employees were compensated fully for their services by the cash salary and hourly cash wages paid them. Full agreed remuneration was paid in cash to each employee, whether or not the employee availed himself or herself of the Programs.